IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

C.J. PAYTON-HUEBNER,

    Plaintiff,

v.                                                No. CIV-01-1233 WJ/LCS

CITY OF ROSWELL, et al.,

    Defendants.

**MEMORANDUM OPINION AND ORDER**
**ON THE ISSUE OF DAMAGES**

THIS MATTER comes before the Court pursuant to Plaintiff's Motion for Default Judgment [Docket No. 7] with regard to Plaintiff's Title VII, Section 1983, and state law claims. The Clerk of Court entered default in this case on March 18, 2002 [Docket No. 9]. The Court entered default judgment on the issue of liability on April 25, 2002 [Docket No. 11]. An evidentiary hearing on damages was held on October 17, 2002.[1] Since Defendants failed to enter an appearance, file an answer, or otherwise defend this suit, they were not entitled to notice of the hearing. Consequently, the only evidence presented to the Court was the testimony of James Huebner, C. J. Payton-Huebner and Brian McDonald, Ph.D., an economist who gave expert opinion testimony on damages. For the reasons below, I find that Plaintiff is entitled to damages in the amounts specified.

---

[1] For purposes of the hearing on damages, this case was consolidated with CIV 01-1238 WJ/LCS.

**FACTUAL FINDINGS**

Plaintiff was employed by the City of Roswell as a dispatcher for the Roswell Police Department. She was employed for less than two years before her employment ended on May 11, 2000. In December 1999, James Huebner, a police officer with the Department, became Plaintiff's supervisor. Mr. Huebner's position as a supervisor for dispatch was a daytime position. At some point, Plaintiff and Mr. Huebner began a relationship. In March 2000, Mr. Huebner moved into Plaintiff's home. The nepotism policy in effect at the time stated:

> In the event that two employees are in position of direct or indirect supervision through any departmental chain of command and/or are in positions in the Fire or Police Departments where their job duties may require them to be in communication with each other during an emergency response situation, and these two employees establish a relationship . . . through life-style accommodations being the substantial equivalent of a family relationship, then one of the employees shall remove himself to another position which is not under direct or indirect supervision of the other, subject to the approval of the City Manager. Such transfer shall occur within fourteen (14) calendar days of the change in relationship. Should neither of the individuals volunteer for transfer, the employee with the least amount of full-time, continuous service with the city shall be transferred by management, if a position is available, or laid off, if no vacancy is available for which the individual is qualified.

City of Roswell Personnel Rules and Regulations, Chapter IV § 420.0(C), admitted as Exhibit 3 at the hearing on damages.

Plaintiff notified the Department of her relationship with Mr. Huebner and volunteered for a transfer in accordance with the city policy on nepotism. Between Plaintiff and Mr. Huebner, Plaintiff was the employee with the least amount of full-time, continuous service with the city. Thus, even if she had not volunteered for a transfer, she would be the employee transferred involuntarily pursuant to the policy.

A position for which Plaintiff was qualified was available within the Police Department.

The position would have removed her from any direct or indirect supervision by Mr. Huebner, and would have eliminated the possibility that she would have to communicate with Mr. Huebner during an emergency response situation. In accordance with the policy, Plaintiff should have been transferred. However, her request for transfer was denied. Chief of Police Richard Campbell informed Plaintiff that he was denying her request for transfer because the transfer would result in a pay cut for Plaintiff and he did not want the Department to be sued when Plaintiff's relationship with Mr. Huebner ended.

In response to the relationship between Plaintiff and Mr. Huebner, the Department notified Mr. Huebner that he had the option of ending the relationship, resigning from the Department, being fired from the Department, or accepting a transfer. Before Mr. Huebner was able to communicate further with the Department about his decision, the Department transferred him to a swing shift position. Mr. Huebner's transfer was not in accordance with the policy on nepotism given that Plaintiff volunteered to transfer and given that Plaintiff was the employee, who by the clear terms of the policy, would face a choice of transfer or layoff.

Both Plaintiff and Mr. Huebner were told that Mr. Huebner was being transferred in order that he be made an example. Mr. Huebner was told that he was being transferred to the less desirable swing shift because of his refusal to end the relationship with Plaintiff. In the interim between Plaintiff's request for a transfer and Mr. Huebner's actual transfer, Mr. Huebner was ordered to move from the home he then shared with Plaintiff. Additionally, Plaintiff and Mr. Huebner were ordered to have no contact with one another of any kind until Mr. Huebner's transfer was effected. Mr. Huebner was required to get special permission to return to his home for uniforms and other essential personal items.

After Mr. Huebner's transfer, he was permitted to move back into the home. However, Department supervisors began to harass Plaintiff and Mr. Huebner. Plaintiff was written up for talking with Mr. Huebner on the phone during work hours. Other dispatchers were permitted to speak on the phone with spouses, children, and friends during work hours so long as they performed their duties. Plaintiff, however, was told that she was not permitted to speak with Mr. Huebner during work hours, and that speaking with Mr. Huebner was per se neglectful of Plaintiff's duties.

Plaintiff was written up for abuse of sick leave. May 1, 2000 was Plaintiff's day off, and she had dental work done on that day. On May 2, 2000, Plaintiff called in sick because of pain from the dental work. On May 3, 2000, Plaintiff took time off work for a previously scheduled doctor's appointment. When Plaintiff returned home from the doctor's office, there was a note on her front door and a message on her answering machine informing her that she would be required to bring in a doctor's note to return to work. She was then written up for abusing sick leave after using only two consecutive days of sick leave. Plaintiff was then subjected to an internal investigation regarding her use of sick leave and regarding her relationship with Mr. Huebner.

Plaintiff's home became the subject of police surveillance. Between March and May of 2000, Plaintiff frequently saw patrol cars near her home. Patrol cars would park behind her home and the officer within the car would watch her home with binoculars. Mr. Huebner confronted Commander Smith of the Roswell Police Department whom Plaintiff had seen parked behind the house in a patrol car. Smith admitted having been parked behind the house and stated he had just wanted to see where Mr. Huebner lived.

According to Plaintiff, as a consequence of the harassment, including surveillance and investigation, she felt like a criminal, and ultimately left her employment with the Department. Plaintiff suffered emotional distress, mental and physical pain and anguish, humiliation, ridicule, embarrassment, damage to her reputation, and loss of enjoyment of life.

M. Brian McDonald, Ph.D. was admitted as an expert at the hearing on damages. His report was admitted as Exhibit 1. His testimony and his report indicate that, at the time of Plaintiff's termination from her employment with the Department, her base hourly rate was $8.834 per hour. Plaintiff also worked overtime and was paid for these overtime hours. In 1999, Plaintiff had W-2 Medicare wages of $25,906.91. Based upon her payroll stub ending March 17, 2000, she had earned $5,311.52. On an annualized basis, her 2000 wages would have been $25,495. In 2001 and 2002, Plaintiff would have received salary increases equal to the national average increase in wages which was 4.1% in 2001 and 3.5% in 2002. The value of non-pension, employer-paid fringe benefits is estimated at 17.81% of annual salary which is a national average fringe benefit rate for non-pension fringes based on the March 2001 Employment Cost Trends of the U.S. Bureau of Labor Statistics.

**LEGAL CONCLUSIONS**

Because default judgment was entered for Plaintiff on the issue of liability, the damages determination in this case is premised on the assumption that each of Plaintiff's allegations of fact are true, and each of her claims is established as a matter of law. Thomson v. Wooster, 114 U.S. 104 (1885); In re The Home Restaurants, Inc., 285 F.3d 111, 114 (1st Cir. 2002). Mitigation is an affirmative defense. Because Defendants did not appear to defend this action and did not assert the defense of mitigation, the damages awards do not take into account any failure of

Plaintiff to mitigate her damages. Plaintiff's requested relief includes backpay, frontpay, and the value of her lost PERA benefits. Additionally, Plaintiff seeks compensatory damages for emotional distress.

I.  PLAINTIFF'S REQUEST FOR BACKPAY

Plaintiff's request for backpay damages may be awarded pursuant to Title VII, 42 U.S.C. § 2000e-5(g). She is also entitled to these damages pursuant to the other claims in her complaint. The object of the backpay provisions of Title VII is to make employees whole for losses suffered on account of unlawful discrimination, and federal courts are empowered to make whole the victims of discrimination. Franks v. Bowman Transp. Co., 424 U.S. 747 (1976); Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 39 F.3d 1482, 1493 (10th Cir. 1994). I find that Plaintiff suffered economic losses as the result of the termination of her employment. Thus, she is entitled to an award of backpay for those losses. The award includes her lost wages and lost non-pension fringe benefits. Based on the above findings, the testimony of Plaintiff's expert, and the calculations in the expert's report, admitted as Exhibit 1 at the hearing, I find that Plaintiff's backpay award for the year 2000 is $19,198, for 2001 is $31,267, and for 2002 is $32,362. Thus, Plaintiff's total backpay award is $82,827.

II.  FRONTPAY AND LOST PERA BENEFITS

As noted above, the purpose of the remedies provisions of Title VII is to make the victim of discrimination whole. However, damages may not be based on speculation. Metz, 39 F.3d at 1494. The award of backpay damages provides Plaintiff more than two years compensation for the loss of a job that she only held for two years. This is more than sufficient to make Plaintiff whole. Plaintiff requests 17 years of frontpay and 25 years worth of retirement pay. Plaintiff's

6

request for frontpay and full retirement pay is based on the theory that she would have remained employed with the City of Roswell for the remainder or her work life and retired from the City with a full pension. Based on the fact Plaintiff had only been employed with the City for two years at the time of her termination, her theory for the recovery of frontpay and lost PERA benefits is speculative. Thus, I find that Plaintiff is not entitled to an award of frontpay or lost PERA benefits.

III.     PLAINTIFF'S REQUEST FOR COMPENSATORY DAMAGES

Plaintiff's request for compensatory damages may be awarded pursuant to Title VII, 42 U.S.C. § 2000e-5(g) and pursuant to the other claims in her complaint. I find, based on the allegations in Plaintiff's complaint and her testimony at the hearing, that Plaintiff is entitled to compensatory damages in the amount of $25,000.

**CONCLUSION**

IT IS THEREFORE ORDERED that Plaintiff is awarded $82,827 in backpay.

IT IS FURTHER ORDERED that Plaintiff is awarded $25,000 in compensatory damages.

_____
UNITED STATES DISTRICT JUDGE